No. 88,523

STATE OF KANSAS, *Appellee,* v. SASHADA MAKTHEPHARAK, *Appellant.*

(78 P.3d 412)

Opinion filed October 31, 2003.

*Roger L. Falk,* Law office of Roger L. Falk & Associates, P.A., of Wichita, argued the cause, and *Christopher L. Hughes,* of the same firm, was with him on the brief for appellant.

*Debra S. Peterson,* assistant district attorney, argued the cause, and *Nola Foulston,* district attorney, and *Phill Kline,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Sashada Makthepharak appeals his convictions for first-degree felony murder, aggravated burglary, and criminal possession of a firearm.

We must address five issues: (1) Should Makthepharak's admissions to police have been suppressed? (2) Did the district court err in giving an *"Allen*-type" instruction before the jury began its deliberations? (3) Did sufficient evidence support Makthepharak's convictions for first-degree felony murder and aggravated burglary? (4) Should the jury have received requested instructions on lesser included offenses of felony murder? and (5) Should the jury have received a requested instruction on the meaning of "intentionally"?

Although Makthepharak listed a sixth issue on the propriety of the district court's instruction on aggravated battery, his brief fails to further address the issue and it is therefore deemed abandoned. See *State v. Brown,* 272 Kan. 843, 844, 35 P.3d 910 (2001).

Makthepharak was 16 years old at the time of the crimes at issue in this case. He had the equivalent of a seventh grade education

and had taken classes in English as a second language. He also was taking mood stabilization medication for depression.

The victim, Chanh Chantivong, died from multiple gunshot wounds suffered when several men armed with 17 guns entered the Wichita home of Vouth Sim. Forensic evidence showed that Chantivong had been shot 16 times and stabbed once. Both .45 caliber and .22 caliber guns had been used to inflict Chantivong's wounds, and 26 spent shell casings from 6 weapons of three different sizes were found at the scene. Chantivong had fired a 9 millimeter semi-automatic handgun during the chaos.

Officers arrested Makthepharak late in the day after Chantivong's murder. Makthepharak was taken to the police department, where he was placed in an interview room, handcuffed to a table that was bolted to the floor, and made to wait approximately half an hour. Detectives then entered the room and read Makthepharak his *Miranda* rights. Makthepharak waived his rights and agreed to speak to the police.

Makthepharak's first interview began at about 10 p.m. and ended at about 3:30 a.m. During the course of the interview, Makthepharak's mother came to the police station and asked to see her son. She was told she could wait and speak to him when the interview had ended; she ultimately elected to leave the station before the interview was over and thus did not see Makthepharak.

Makthepharak told the detectives that he was a member of a gang called the "Dead Everlasting Gangsters." He and friends had gone to Sim's house, a gang house for the "Asian Pride" or the "East Side Crips," twice on the night of the murder.

During the first visit, there was a confrontation with Chantivong, and either Makthepharak or one of his associates displayed a gun. Also, according to Chantivong's brother, two shots were fired as Makthepharak and his friends departed. After Makthepharak and his friends had driven away, Chantivong sent his brother to retrieve Chantivong's gun from home. The brother returned with the 9 millimeter.

Although Makthepharak's statements about the second visit to Sim's house initially varied from one telling to the next, he ultimately told the detectives that he and his friends returned to the

house to issue a "violation" for what they regarded as disrespect shown him by members of Asian Pride. The violation would take the form of a beating, such as one meted out to another individual earlier. That person had been bound and placed in a bathtub, then attacked.

On the second visit to Sim's house, according to Makthepharak, he hid behind a car while others kicked in the door. He then followed them inside and heard gunfire. Makthepharak said he then went into the room where the shots were fired and saw Chantivong was wounded. Makthepharak would not reveal the identities of the other gang members involved.

Although Makthepharak continued to deny being present in the room when Chantivong was shot, it was he who first told the police that Chantivong also had been stabbed, that Sim's mother also had been battered in the hallway of the house, and that Chantivong had fired his gun.

After his first interview, Makthepharak was housed at the juvenile detention facility, which was familiar to him from three previous stays. When asked on his admission to the facility if he was taking any medication, Makthepharak denied that he was. Makthepharak remained at the detention facility for the remainder of the night of his first interview, all of the following day and night, and part of the next day also. He was then interviewed again at the police station.

During his stay at the detention facility, Makthepharak had an opportunity to eat, rest, and be physically active. He also had the opportunity to use a telephone to call his mother, although he did not choose to do so. Makthepharak also would have been permitted to have visitors. He had none.

At Makthepharak's later suppression hearing, Detective Tim Relph testified that Makthepharak responded coherently and reasonably to questions during his interviews. Makthepharak also had indicated that he read and understood English, and the detective characterized Makthepharak's spoken English as "very good." When given his *Miranda* warnings, Makthepharak said he understood all of his rights. Makthepharak also was given a 30-minute break during his first interview, was offered something to drink,

and was offered the chance to use the restroom. In addition, Makthepharak had experience with the criminal justice system. He stipulated at trial that he had been adjudicated a juvenile offender for an act that would have been a felony if it had been committed as an adult.

At trial, Sim's mother testified through a sworn interpreter that, on the night of Chantivong's murder, she heard someone kick in the door to the house. She initially tried to open an inside door to her son's room, where Chantivong was, but it was locked. She then hid because she thought there was an intruder in the house. After she heard shots, a man came into a hallway, pointed a gun at her head, and said, "Kill, kill."

When the jury was instructed before it began deliberations, the district court judge included PIK Crim. 3d 68.12 over a defense objection. The instruction said:

"This is an important case. If you should fail to reach a decision, the case is left open and undecided. Like all cases, it must be decided sometime. Another trial would be a heavy burden on both sides.

"There is no reason to believe that the case can be tried again any better or more exhaustively than it has been. There is no reason to believe that more evidence or clearer evidence would be produced on behalf of either side.

"Also, there is no reason to believe that the case would ever be submitted to 12 people more intelligent or more impartial or more reasonable than you. Any future jury must be selected in the same manner that you were.

"This does not mean that those favoring any particular position should surrender their honest convictions as to the weight or effect of any evidence solely because of the opinion of other jurors or because of the importance of arriving at a decision.

"This does mean that you should give respectful consideration to each other's views and talk over any differences of opinion in a spirit of fairness and candor. If at all possible, you should resolve any differences and come to a common conclusion.

"You may be as leisurely in your deliberations as the occasion may require and take all the time you feel necessary."

## Suppression of Admissions

Makthepharak argues first that his admissions were not voluntary.

"The ultimate issue of voluntariness of a confession is a legal question requiring independent appellate determination. See *Arizona v. Fulminante*, 499 U.S. 279,

287, 113 L. Ed. 2d 302, 111 S. Ct. 1246 (1991); *State v. Vandiver*, 257 Kan. 53, 57-58, 891 P.2d 350 (1995). ' "In reviewing a trial court decision regarding the suppression of evidence, we review the factual underpinnings of the decision by a substantial competent evidence standard of review and review the ultimate legal decision drawn from those facts de novo with independent judgment." [Citations omitted.]' " *State v. Sanders*, 272 Kan. 445, 452, 33 P.3d 596 (2001), *cert. denied* 536 U.S. 963 (2002) (quoting *State v. Baston*, 261 Kan. 100, 104-05, 928 P.2d 79 [1996]).

In addition, with regard to waiver, we have said that a criminal defendant's waiver of *Miranda* rights must be knowing, voluntary, and intelligent under the totality of the circumstances. See *State v. Matson*, 260 Kan. 366, Syl. ¶ 4, 921 P.2d 790 (1996); *State v. Morris*, 255 Kan. 964, Syl. ¶ 1, 880 P.2d 1244 (1994). "If there is substantial competent evidence to support the trial court's findings that the defendant voluntarily, knowingly, and intelligently waived his rights, such findings will not be disturbed on appellate review." *State v. Esquivel-Hernandez*, 266 Kan. 821, 826, 975 P.2d 254 (1999).

Makthepharak's status as a juvenile also commands us to examine certain factors on the way to determining voluntariness: (1) his age, (2) the length of the questioning, (3) his level of education, (4) his prior experience with law enforcement authorities, and (5) his mental state. See *State v. Young*, 220 Kan. 541, 546-47, 552 P.2d 905 (1976). Makthepharak complains that the district judge failed to consider these *Young* factors, and it is true that the record reflects no explicit discussion of them.

To date, we have not required that a district judge expressly review the factors set out in the *Young* case on the record. We have, however, strongly suggested that the factors be considered. *State v. Davis*, 268 Kan. 661, 675-76, 998 P.2d 1127, *cert. denied* 531 U.S. 855 (2000). In our view, there was no reversible error here, although the better practice when a district judge is evaluating whether a juvenile voluntarily confessed or waived rights is to discuss the *Young* factors explicitly on the record. Here, it is evident that the ultimate analysis and outcome on the voluntariness issue would not have changed if the judge had been more explicit about consideration of the factors.

Makthepharak was 16, as opposed to a younger adolescent, at the time of his arrest. We have held that parental involvement in law enforcement interviews is not required where the suspect is older than 14. *State v. Ramos*, 271 Kan. 520, 526, 24 P.3d 95 (2001). The length of the first interview was reasonable in view of the seriousness of the crime, the number of potential suspects, and Makthepharak's initial confusing minimization of his role. Makthepharak was given a 30-minute break during the first interview in which he could have gotten a drink or used the restroom if he felt the need. Although Makthepharak's formal education was limited and he had been suffering from depression, he displayed no inability to understand questions or respond sensibly and appropriately. In addition, he was well acquainted with the workings of the criminal justice system.

The district court judge, in view of the totality of the circumstances, had substantial competent evidence to support his finding that Makthepharak voluntarily, knowingly, and intelligently waived his rights. We will not disturb this finding on appeal. Furthermore, based on our review of the record and the *Young* factors peculiarly applicable to suspects of Makthepharak's age, we determine de novo on appeal that his admissions to the detectives were voluntary and that the district court did not err in admitting evidence of those admissions in his trial. See *Sanders*, 272 Kan. at 452.

### Allen-type Instruction

Makthepharak's second argument on appeal is that his jury should not have been given PIK Crim. 3d 68.12, which he characterizes as an *Allen*-type instruction. See *Allen v. United States*, 164 U.S. 492, 501-02, 41 L. Ed. 528, 17 S. Ct. 154 (1896). He contends this type of instruction was inappropriate because the evidence against him was weak.

Because Makthepharak's counsel preserved this issue for appeal by contemporaneous objection, our standard of review is as follows:

" 'When reviewing challenges to jury instructions, we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions

do not constitute reversible error even if they are in some way erroneous. [Citations omitted.]' " *State v. Peterson*, 273 Kan. 217, 221, 42 P.3d 137 (2002).

In addition, we bear in mind that

" '[t]he use of PIK instructions is not mandatory but is strongly recommended. The pattern instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions. They should be the starting point in the preparation of any set of jury instructions. If the particular facts in a given case require modification of the applicable pattern instruction, or the addition of some instruction not included in PIK, the trial court should not hesitate to make such modification or addition. However, absent such need, PIK instructions and recommendations should be followed.' [Citations omitted.]" *State v. Kleypas*, 272 Kan. 894, 1035, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002).

The PIK "Notes on Use" section for PIK Crim. 3d 68.12 states that the "instruction can be given in substance with the other instructions at the conclusion of the case." Makthepharak nonetheless argues that we have disapproved of the use of this instruction in the past.

Our disapproval has been limited to situations in which such an instruction was given to a jury *after* deliberations were in progress. In those situations, we noted, such an instruction could exert undue pressure on the jury to reach a verdict. See, *e.g., State v. Struzik*, 269 Kan. 95, Syl. ¶ 6, 5 P.3d 502 (2000); *State v. Boyd*, 206 Kan. 597, 600-01, 481 P.2d 1015 (1971), *cert. denied* 405 U.S. 927 (1972); *Bush v. State*, 203 Kan. 494, 498-99, 454 P.2d 429 (1969). In contrast, we have held that it is not error to give this type of an instruction before a jury retires to begin deliberations. *State v. Roadenbaugh*, 234 Kan. 474, 483, 673 P.2d 1166 (1983); *State v. Irving*, 231 Kan. 258, 265-66, 644 P.2d 389 (1982). That was the situation in Makthepharak's trial, and we thus hold the district judge did not err in giving the jury this instruction.

### Sufficiency of the Evidence

Makthepharak next asserts there was insufficient evidence to convict him of first-degree felony murder and aggravated burglary. Our standard of review is:

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light

most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. [Citation omitted.]" *State v. Evans*, 270 Kan. 585, 590, 17 P.3d 340 (2001).

To obtain a conviction on the aggravated burglary charge, the State was required to prove that Makthepharak knowingly entered into or remained within Sim's house without authority and with intent to commit aggravated battery. Neither an attempted nor a completed aggravated battery was a required element. The State also had to prove that there was another human being in the residence at the time and that the act occurred on or about May 25, 2001, in Sedgwick County.

To prove first-degree felony murder, the State had to prove that Makthepharak killed Chantivong during the commission of or while attempting to commit aggravated burglary and that the act occurred on or about May 25, 2001, in Sedgwick County.

Makthepharak argues that no witnesses placed him at the scene of the crime at the time of the murder. He also says there was no evidence that he incited people to take up arms and break into the house to harm Chantivong or that he possessed an intention to commit an aggravated battery.

In response, the State correctly points out that Makthepharak, by his own admission, led a group to Sim's house for the purpose of issuing a "violation" for disrespect. Makthepharak further explained that a violation required a beating to be administered, and he and his colleagues took 17 guns along on their mission. Makthepharak also was the source of the information about the vicious beating endured by another individual to whom a violation had been issued in the past. Makthepharak told the detectives that one of the people with him had seized a woman in the hallway after they broke in and said Chantivong had started shooting at them and they shot back. In addition, Sim's mother supplied evidence that the door to the house had been kicked in. All of this evidence was entirely sufficient to support Makthepharak's convictions for aggravated burglary and first-degree felony murder.

Makthepharak also attempts to invoke a two-step version of the merger doctrine to obtain reversal of his felony-murder conviction. He contends that the aggravated burglary cannot be the underlying

felony for felony murder because it rests in turn on an aggravated battery that is too indistinct from the homicide itself.

K.S.A. 21-3436, as amended, lists certain inherently dangerous felonies that do not merge with homicide and therefore can support a felony-murder charge. *State v. Lamae*, 268 Kan. 544, 556, 998 P.2d 106 (2000). Aggravated burglary is one of them. See K.S.A. 2002 Supp. 21-3436(a)(10). Aggravated burglary merely required him to have intended to commit an aggravated battery when he entered or remained in the house without authorization; it did not require him to have attempted or completed an aggravated battery. The use of the intention to commit aggravated battery to support the aggravated burglary does not require application of the merger doctrine here. We decline Makthepharak's invitation to two-step.

### Lesser Included Offenses of Felony Murder

Makthepharak argues that the district court erred in refusing to instruct the jury on second-degree murder and voluntary manslaughter as lesser included offenses of felony murder, because the State's evidence supporting aggravated burglary was weak or inconclusive. See *State v. Sandifer*, 270 Kan. 591, 597-98, 17 P.3d 921 (2001). Because the district judge regarded the evidence to support aggravated burglary as strong, he refused to give the lesser included offense instructions.

We have already ruled that the evidence of aggravated burglary was sufficient. In fact, it was more than sufficient.

The door to Sim's house was kicked in. Makthepharak told police that he and the others went to the house, carrying 17 guns, to issue a violation. A previous violation had led to a vicious beating. Chantivong was ultimately shot 16 times and stabbed once. Sim's mother heard intruders kick in the door and heard shots. She was then grabbed by one of the men and was threatened with a gun. Makthepharak admitted to being present for this assault.

With such overwhelming evidence of intent to commit an aggravated battery and, thus, of having committed aggravated burglary, the district judge did not err in refusing to instruct the jury on lesser included offenses of felony murder.

### Instruction Defining "Intentionally"

Finally, Makthepharak argues that the district judge erred in refusing to give his requested instruction on the meaning of "intentionally." Our standard of review on this issue is the same as that quoted above on the *Allen*-type instruction.

Makthepharak's requested instruction defined "intentionally" as "conduct that is purposeful and willful and not accidental. Intentional includes the terms 'knowing,' 'willful,' 'purposeful' and 'on purpose.' " This language comes directly from the homicide definitions in PIK Crim. 3d 56.04(d) and conforms to K.S.A. 21-3201(b).

The jury was given the following instruction from PIK Crim. 3d 54.01:

> "Ordinarily, a person intends all of the usual consequences of his voluntary acts. This inference may be considered by you along with all the other evidence in the case. You may accept or reject it in determining whether the State has met its burden to prove the required criminal intent of the defendant. This burden never shifts to the defendant."

Makthepharak asserts that the district judge's failure to give his requested instruction was prejudicial because the jury was told the State had to prove Makthepharak entered or remained in the house with the intent to commit an aggravated battery and aggravated battery meant "[t]hat the defendant *intentionally* caused bodily harm to another person with a deadly weapon or in a manner whereby great bodily harm, disfigurement or death could be inflicted."

He argues that these instructions could have confused the jury and resulted in a conviction based on his colleagues' criminal intent rather than his own.

Makthepharak's proposed instruction was similar to a part of PIK Crim. 3d 54.01-A on general criminal intent. Aggravated burglary is a specific intent crime; aggravated battery is a general intent crime. *State v. Bradford*, 272 Kan. 523, 535, 34 P.3d 434 (2001); *State v. Campbell*, 30 Kan. App. 2d 70, Syl. ¶ 1, 39 P.3d 97, *rev. denied* 273 Kan. 1037 (2002). As discussed above, the underlying felony for the felony murder in this case was aggravated burglary,

not aggravated battery. We have previously pointed out that PIK Crim. 3d 54.01-A should be used only where the crime requires a general criminal intent. *State v. Yardley*, 267 Kan. 37, 42-43, 978 P.2d 886 (1999). PIK Crim. 3d 54.01, on the other hand, is consistent with the principles of felony murder.

We are satisfied that the instructions in this case, taken as a whole, sufficiently defined "intentionally." The jury was correctly instructed on the elements of aggravated burglary, the elements of aggravated battery upon which the aggravated burglary charge was based, and the elements of felony murder. Further, the jury was instructed on aiding and abetting. The instructions, read as a whole, sufficiently instructed the jury on the requisite intent for the crimes charged. The district court did not err in failing to give the defendant's proposed general instruction defining "intentionally."

Affirmed.