IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 112,231

STATE OF KANSAS,
*Appellee*,

v.

JERRY THACH,
*Appellant*.

SYLLABUS BY THE COURT

1.

An appellate court reviews the sufficiency of the evidence by looking at all the evidence in a light most favorable to the prosecution and determining whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. A reviewing court will not reweigh evidence, resolve evidentiary conflicts, make witness credibility determinations, or otherwise usurp the role of a jury.

2.

Kansas Supreme Court Rule 6.02(a)(5) (2015 Kan. Ct. R. Annot. 41) requires an appellant raising a constitutional issue for the first time on appeal to affirmatively invoke and argue an exception to the general rule that such claims may not be raised for the first time on appeal. Failure to satisfy Rule 6.02(a)(5) in this respect amounts to an abandonment of the constitutional claim.

1

3.

The State may use circumstantial evidence to prove a defendant's conscious objective or desire to engage in the conduct or cause the result of a charged crime and thus meet the mental state requirement defined in K.S.A. 2015 Supp. 21-5202(h). Using circumstantial evidence, the State presented sufficient evidence of the defendant's mental state in this case.

4.

Premeditated and felony murder are not separate, distinct offenses but are two separate theories under which the crime of first-degree murder may be committed. Presenting alternative theories of premeditated and felony murder does not offend due process.

Appeal from Sedgwick District Court; GREGORY L. WALLER, judge. Opinion filed September 9, 2016. Affirmed.

*Michael P. Whalen*, of Law Office of Michael P. Whalen, of Wichita, argued the cause and was on the brief for appellant.

*Lance J. Gillett*, assistant district attorney, argued the cause, and *Marc Bennett*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Jerry Thach asks us to determine whether sufficient evidence supports his convictions for felony murder and aggravated burglary, charges which stem from the violent death of Pheng Xiong on August 4, 2012. Thach admits to being one of

four men who broke into Xiong's home and killed him. Thach argues there was insufficient evidence of his intent and that as a result his convictions should be vacated.

We disagree. The crux of Thach's argument is a challenge to the State's proof of aggravated burglary—which is important not only as a stand-alone criminal conviction, but also as the underlying inherently dangerous felony required to support Thach's felony-murder conviction. For purposes of both convictions, the aggravated burglary was, as charged, based on Thach's entry into Xiong's home with the "intent to commit an Aggravated Battery." Thach's intent is the main issue here: Due to the charging structure, the State was required to prove Thach's intent to commit aggravated battery in order to prove the aggravated burglary and the felony-murder convictions.

The State did so. A reasonable jury could readily conclude Thach entered Xiong's house with the conscious objective of committing aggravated battery, which is enough to uphold his convictions for aggravated burglary and, in turn, felony murder. We reject Thach's attempt to force the State to provide direct evidence of his intent—circumstantial evidence has long been acceptable as evidence of this criminal element, and the legislature's adoption of K.S.A. 2015 Supp. 21-5202 does not require us to depart from our well-established precedent on this point.

As a separate matter, we are unpersuaded by Thach's argument that his due process rights were violated by the State's choice to seek convictions on, in the alternative, first-degree premeditated murder and first-degree felony murder charges.

Accordingly, we affirm Thach's convictions.

3

FACTUAL AND PROCEDURAL BACKGROUND

Thach's trial spanned 7 days and included testimony from 29 witnesses. We need not recount the entirety of the trial and will instead focus on the testimony most relevant to Thach's appeal—that of Vat Sana Khamvongsa, who participated in the crimes; law enforcement officers who took Thach's statement; and the coroner.

Khamvongsa testified Thach picked him up around 9 p.m. on August 3, 2012. They had plans to go out and first stopped at Rathanak Chea's house. While they were waiting for Chea, who was not home, Xiong and his girlfriend arrived. Once Chea came home the entire group went inside to watch television and drink. At some point Chea left to pick up another man, Caesar Louis. Khamvongsa, Chea, Louis, and Thach left for a bar around midnight; Xiong met them there after taking his girlfriend home.

The group went to a total of three bars over the course of the evening. After the bars closed, Chea, Louis, Khamvongsa, and Thach went back to Chea's house, arriving around 2:30 or 2:45 a.m. Xiong did not go with them. Sometime after 3 a.m., Khamvongsa heard Chea and Louis "talking about some problem they had" with Xiong. Apparently, Xiong, whom Khamvongsa thought was a member of the Dead Everlasting Gangsters (DEG), had gotten into a fight with some of their friends at a restaurant. Chea and Louis, who were both members of a different gang, the Asian Boyz (AB), were angry because Xiong was boasting and lying about beating up their friends.

Louis and Chea's conversation became more heated, and Louis expressed a desire to go to Xiong's house. Chea knew where Xiong lived, and he told Louis, "You've got a problem. Handle it." Khamvongsa took this to mean Louis "was going to go fight or

4

something." Chea did not initially do anything to indicate to Khamvongsa this would be more than a fistfight, but after a little while Chea brought out a big hunting knife. Khamvongsa touched the knife after one of the men asked him to see if it was sharp. The conversation turned to heading over to Xiong's house, and eventually Louis, Chea, Thach, and Khamvongsa left together in Chea's car. According to Khamvongsa, Thach did not at any point hesitate or resist going to Xiong's house.

Once the four men arrived at Xiong's house, Louis knocked loudly about 15 times. Xiong did not answer the door and Chea went around the side of the house. Meanwhile, Thach kicked the front door three times—but he stopped when he was told he was making too much noise. Chea then went to the other side of the house and said, "I got him." When the other three men went to look, they saw Chea holding a struggling Xiong, who was halfway out the window. At Chea's request, Khamvongsa held one of Xiong's arms while Thach and Chea went through the bedroom window and into the house.

One of the men then went through the house and opened the front door. Louis walked inside and Khamvongsa followed, after giving control of Xiong to Louis, Chea, and Thach. By the time Khamvongsa joined the others, Xiong had been beaten—he was pretty bruised up. Khamvongsa initially told police Thach was the first person into Xiong's home and had been hitting Xiong, but on cross-examination he testified he never actually saw anybody inflict Xiong's bruises and did not hear punches being thrown. Khamvongsa saw Thach standing by Xiong's legs at the foot of the bed, with Chea and Louis on either side of the bed. Louis slowly pulled out the hunting knife. Thach complied with Louis' direction to see if anyone else was in the house, and Thach then returned to the foot of the bed and held down Xiong's legs. Louis taunted Xiong and eventually asked Xiong if he had any last words. Louis then cut Xiong's throat.

5

At that point, Louis tried to hand Khamvongsa the knife as he asked whether Khamvongsa "was down." Khamvongsa said, "No," and refused the knife. Khamvongsa did not recall Louis offering the knife to Thach or Chea. Louis told Khamvongsa to turn around and face the wall, which Khamvongsa did. Khamvongsa then heard a sound he believed to be blood gushing. Nobody said to stop, and Thach continued to hold onto Xiong's legs.

Thach, Louis, and Chea cleaned some blood splatters and wiped down areas the men had touched. Louis warned the group not to get on their phones, and the men headed out the door. After making sure nobody was outside to see them, the men got into Chea's car and drove off. At this point, Louis had Xiong's cell phone and Thach had the knife.

According to Khamvongsa's testimony, when the men arrived back at Chea's house, Chea got everyone a beer. Nobody tried to leave. Louis seemed to be acting normally, and Chea even seemed pretty happy. Chea kept saying, "Don't fuck with us," which Khamvongsa thought meant don't mess with the AB's—the Asian Boyz gang. At one point in Khamvongsa's testimony he indicated Thach acted the same as he had before they drove to Xiong's house, but he later said Thach acted scared. Louis warned Khamvongsa that if anybody asked, he did not know Louis' name—but Louis did not give Thach a similar warning. After about 20 minutes, Thach took Khamvongsa home. Khamvongsa initially testified he and Thach did not speak on the drive, but he later stated Thach had told him not to freak out and not to think about it too much.

According to Khamvongsa, the four men did not discuss what would happen at Xiong's house before they arrived—it just happened. He turned himself into the police

6

and testified at Thach's trial in exchange for the State dropping the most serious charge against him.

Thach did not testify at trial, but law enforcement officers testified about his statements to police. Thach repeatedly denied going anywhere before heading out to the bars, but he eventually admitted he had briefly been at Chea's house. Thach did not initially remember Xiong being at Chea's that night but later asserted Xiong was present along with his girlfriend. He admitted being with Xiong at the bars on the night of the murder, but he claimed he took Khamvongsa straight home once the bars closed and arrived home himself at 2:30 a.m. He unwaveringly denied ever being at Xiong's home on the night of August 3 or the morning of August 4.

Police eventually told Thach there was physical evidence putting him at Xiong's house—a tentative fingerprint match found on a broken Heineken bottle in one of Xiong's neighbor's yard. The police also confronted Thach with cell phone records, which showed text message exchanges between Thach and others up until a little before 3 a.m. on August 4, after which there were no incoming or outgoing texts from Thach's phone until noon. According to law enforcement testimony, after being shown these messages Thach changed his story to say he went to his girlfriend's house but did not go inside until 4 a.m. He said he stayed outside her house from 2:30 until 4 a.m., texting her about a disagreement they were having.

The coroner testified Xiong suffered bruising on his face in addition to his extensive neck injury. The bruising occurred before death, but the coroner could not say how much earlier. The coroner explained she found multiple "incised wounds," meaning wounds longer across the skin than deep, caused by a knife or other sharp object and one

7

deep wound that went through Xiong's airway and penetrated clear to his spine. Xiong suffered approximately 20 blunt force injuries.

The State charged Thach with first-degree premediated murder or, alternatively, first-degree felony murder; aggravated burglary; and aggravated robbery. The jury found Thach guilty of the alternative charge of first-degree felony murder and aggravated burglary and not guilty of first-degree premeditated murder and aggravated robbery. The district court sentenced Thach to life imprisonment with a minimum of 20 years for felony murder, plus 49 months for aggravated burglary, to be served consecutively.

ANALYSIS

On appeal, Thach raises two principal issues:  (1) Whether there was sufficient evidence to support his first-degree felony-murder and aggravated burglary convictions; and (2) whether the State's presentation of two theories of first-degree murder violated his due process rights. We reject both claims.

ISSUE 1*: There was sufficient evidence supporting Thach's felony-murder and aggravated burglary convictions.*

As we outlined above, Thach urges us to vacate his convictions on the grounds there was insufficient evidence of intent to commit the charged crimes because there was no evidence Thach entered Xiong's home with the intent to commit an aggravated battery. He also asserts circumstantial evidence cannot be used under K.S.A. 2015 Supp. 21-5202 to establish he acted with the requisite mental state.

8

*Standard of Review*

The State must present "evidence supporting each element of a crime." *State v. Williams*, 299 Kan. 509, 528, 324 P.3d 1078 (2014). We review the sufficiency of the evidence by "looking at all the evidence in a light most favorable to the prosecution and determining whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Frye*, 294 Kan. 364, 374-75, 277 P.3d 1091 (2012). We will not "reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations" or otherwise usurp the role of a jury. *Williams*, 299 Kan. at 525; see *State v. Hall*, 292 Kan. 841, 859, 257 P.3d 272 (2011).

*Statutory Elements*

Keeping in mind the State's duty to prove each element of the charged crimes, we turn now to the specific criminal elements at issue in Thach's case. Thach was convicted of first-degree felony murder based on Xiong's death during the commission of "Aggravated Burglary with the intent to commit an Aggravated Battery." See K.S.A. 2015 Supp. 21-5402(a)(2) ("Murder in the first degree is the killing of a human being committed: . . . in the commission of, attempt to commit, or flight from any inherently dangerous felony"); K.S.A. 2015 Supp. 21-5402(c)(1)(J) (classifying aggravated burglary as an inherently dangerous felony). Thach was also convicted of aggravated burglary, which, similar to the structure of the felony-murder charge, was based on his entry into Xiong's home with the intent to commit aggravated battery. See K.S.A. 2015 Supp. 21-5807(b) ("Aggravated burglary is, without authority, entering into or remaining within any building . . . in which there is a human being with intent to commit a felony.").

9

As we previously mentioned, Thach's sufficiency challenge is focused on whether the State showed he intended to commit aggravated burglary and the underlying aggravated battery—a challenge which, due to the charging structure, affects both his felony-murder and aggravated burglary convictions. See *State v. Brown*, 300 Kan. 565, 581, 331 P.3d 797 (2014) (requiring the State to present sufficient evidence of the underlying felony, even if it need not prove the completion of the underlying felony); *cf. State v. Brown*, 299 Kan. 1021, 1029, 327 P.3d 1002 (2014) (stating, with respect to an aggravated burglary charge, that the State "merely needed to prove that [the defendant] entered into the apartment with the intent to commit an inherently dangerous felony; it did not have to convict him of the underlying felony").

"Aggravated burglary is, without authority, entering into or remaining within any building . . . in which there is a human being *with intent to commit a felony* [such as aggravated battery], theft or sexually motivated crime therein." (Emphasis added.) K.S.A. 2015 Supp. 21-5807(b). Aggravated battery, as relevant to Thach's case, is "knowingly causing bodily harm to another person with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." K.S.A. 2015 Supp. 21-5413(b)(1)(B).

Both these criminal statutes encompass a state of mind element. Kansas law provides the following definition for acting "with intent":

> "A person acts 'intentionally,' or 'with intent,' with respect to the nature of such person's conduct or to a result of such person's conduct when it is such person's conscious objective or desire to engage in the conduct or cause the result. All crimes defined in this

10

code in which the mental culpability requirement is expressed as 'intentionally' or 'with intent' are specific intent crimes." K.S.A. 2015 Supp. 21-5202(h).

See PIK Crim. 4th 52.010 (2015 Supp.) (incorporating this statutory language); *State v. Makthepharak*, 276 Kan. 563, 572, 78 P.3d 412 (2003) ("Aggravated burglary is a specific intent crime . . . .").

Our statutes also set forth a definition for acting "knowingly":

"A person acts 'knowingly,' or 'with knowledge,' with respect to the nature of such person's conduct or to circumstances surrounding such person's conduct when such person is aware of the nature of such person's conduct or that the circumstances exist. A person acts 'knowingly,' or 'with knowledge,' with respect to a result of such person's conduct when such person is aware that such person's conduct is reasonably certain to cause the result." K.S.A. 2015 Supp. 21-5202(i).

The jury instructions properly reflected the elements of the charged crimes and encompassed the applicable statutory mental state for acting with intent. And so, with these statutes in mind, we turn to Thach's arguments and inquire whether there is sufficient evidence showing Xiong died during the commission of an aggravated burglary, which, as charged, requires us to also ask whether there was sufficient evidence Thach entered Xiong's home with the "conscious objective or desire" to knowingly cause bodily harm to Xiong "with a deadly weapon, or in any manner whereby great bodily harm, disfigurement or death can be inflicted." K.S.A. 2015 Supp. 21-5413(b)(1); see *Makthepharak*, 276 Kan. at 570 ("To obtain a conviction on the aggravated burglary charge, the State was required to prove that [the defendant] knowingly entered into or remained within [the victim's] house without authority and with intent to commit

11

aggravated battery"; "[t]o prove first-degree felony murder, the State had to prove that [the defendant] killed [the victim] during the commission of or while attempting to commit aggravated burglary.").

*Thach's arguments lack merit.*

Thach, focusing on the State's pretrial arguments and its opening and closing statements to the jury, contends "[t]he whole presentation [by the State] was about the conspiracy to commit murder, not to go and commit aggravated battery" and "there was no evidence, ever, of anything other than an intent to commit a murder." Thach seems to argue the State failed to prove aggravated battery because it introduced evidence and focused on the theory that Thach and others acted with the sole purpose of *killing*—not just *battering*—Xiong. In other words, the State overshot any intention to commit aggravated battery and, as a result, Thach's convictions must fall.

We need not analyze the underlying legal premise of Thach's argument—or any of the legal or factual assumptions embedded within it—because, regardless of what the State attempted to prove, it failed to convince the jury beyond a reasonable doubt that Thach premeditated Xiong's murder. See *Williams*, 299 Kan. at 525 (prohibiting us from reweighing the evidence). And the State's focus on premeditation—almost to the exclusion of felony murder—does not alter the fact the court instructed the jury on felony murder as an alternative to premeditated murder. Our only concern given the jury's verdict becomes whether the State presented evidence on which a reasonable factfinder could conclude beyond a reasonable doubt that Thach entered Xiong's house with intent to cause bodily harm with a deadly weapon or in a manner by which great bodily harm, disfigurement, or death could result. See *Frye*, 294 Kan. at 374-75 (prompting courts to

12

look at all the evidence in the light most favorable to the State); see also *State v. Daws*, 303 Kan. 785, 789, 368 P.3d 1074 (2016) (explaining that burglary charged as entering into, as opposed to remaining within, occurs "when the evidence shows a defendant crossed the plane of a building's exterior wall").

Thach argues there was insufficient evidence of *his* intent regardless of what the evidence showed about Khamvongsa's mental state (which Khamvongsa said was to commit a battery) or the other men's mental states. He first contends the language defining culpable mental states in K.S.A. 2015 Supp. 21-5202, which he refers to as a "troubling new culpability statute," is in essence "a constitutional nullity." He seems to argue that 21-5202—which replaced an earlier culpability statute as of July 1, 2011— does not provide an objective standard for use by the jury. He then argues the State cannot meet the standard in 21-5202 by relying on circumstantial evidence to prove intent. For both arguments, he cites to the language in 21-5202 focusing on a "person's conscious objective or desire to engage" in the charged conduct.

Regarding the constitutional aspects of Thach's argument, he concedes he did not raise this issue before the district court. We generally decline to hear constitutional arguments raised for the first time on appeal. See *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). As Thach points out, however, appellate courts may hear a constitutional issue for the first time on appeal if the issue falls within at least one of three recognized exceptions. But we require the party asserting the issue to explain how the exception applies. See Kansas Supreme Court Rule 6.02(a)(5) (2015 Kan. Ct. R. Annot. 41) (requiring the complaining party to provide an explanation why the issue is properly before the court); *Godfrey*, 301 Kan. at 1043. Thach fails to identify which exception he relies upon or to explain how the exception fits. Accordingly, his

13

constitutional nullity argument is abandoned under Supreme Court Rule 6.02(a)(5). *Godfrey*, 301 Kan. at 1044.

Nevertheless, Thach also argues the "conscious objective" language of K.S.A. 2015 Supp. 21-5202 means the State cannot prove intent "absent a statement from a defendant as to what they did and what their desired outcome was." In other words, he contends circumstantial evidence is not enough to sufficiently demonstrate a conscious objective.

Certainly, a direct statement by Thach would provide persuasive direct evidence of his conscious objective. And Thach correctly notes that someone else's conscious objective cannot be substituted for his. But that does not mean the circumstances leading one actor to a certain conscious objective cannot be used by a jury to infer another actor would have possessed the same conscious objective.

> "Circumstantial evidence in law is evidence that tends to prove a fact in issue by proving other events or circumstances which, according to the common experience of mankind, are usually or always attended by the fact in issue, and therefore affords a *basis for a reasonable inference* by the jury . . . of the fact in issue." (Emphasis added.) *Casey v. Phillips Pipeline Co.*, 199 Kan. 538, 550, 431 P.2d 518 (1967).

We have previously stated that "[a] conviction of even the gravest offense may be sustained by circumstantial evidence." *State v. Graham*, 247 Kan. 388, 398, 799 P.2d 1003 (1990). And juries have historically used circumstantial evidence to prove intent. *State v. Jones*, 202 Kan. 31, 43, 446 P.2d 851 (1968). Indeed, we have intimated that circumstantial evidence of intent is almost to be expected: "Intent, a state of mind existing at the time an offense is committed, does not need to be and rarely can be

14

directly proven" through direct evidence. *State v. Griffin*, 279 Kan. 634, 638, 112 P.3d 862 (2005).

All of these cases predate July 1, 2011, the effective date of K.S.A. 2015 Supp. 21-5202. We have cited to 21-5202 only a handful of times since its enactment, and neither party has pointed us to a prior decision of this court specifically discussing circumstantial evidence with respect to a defendant's culpable mental state under that particular statute. But see, *e.g.*, *State v. Loyo*, No. 112,179, 2015 WL 7162109, at *4 (Kan. App. 2015) (unpublished opinion) ("The State can prove specific intent . . . with circumstantial evidence."). We do so now.

In interpreting K.S.A. 2015 Supp. 21-5202(h), we

"'first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. [Citation omitted.] When a statute is plain and unambiguous, an appellate court does not speculate as to the legislative intent behind it and will not read into the statute something not readily found in it. Where there is no ambiguity, the court need not resort to statutory construction. *Only if the statute's language or text is unclear or ambiguous does the court use canons of construction or legislative history or other background considerations to construe the legislature's intent.* [Citation omitted.]' (Emphasis added.)" *State v. Keel*, 302 Kan. 560, 572, 357 P.3d 251 (2015), *cert. denied* 136 S. Ct. 865 (2016).

We find no words in K.S.A. 2015 Supp. 21-5202(h) limiting the manner of proving a defendant's conscious objective. Thach's argument seems to be that intent can only be proven by direct evidence because it is a subjective state of mind. But this theory has been soundly rejected by other courts.

15

The language on which Thach focuses comes from the Model Penal Code. See Kansas Criminal Code Recodification Commission, 2010 Final Report to the Kansas Legislature, Vol. 1, 21-23 (December 16, 2009) (explaining effort to clarify Kansas concepts of culpability and recommending closer adherence to the Model Penal Code); see also American Law Institute, Model Penal Code §§ 1.13(11)-(12), 2.02(2)(a)(i) (1985). As one court explained:

"As to the element of intent, it is similarly well-settled that intent may be circumstantially shown through conduct and circumstances.

"'Intentionally' is a familiar concept, requiring one person's 'conscious objective' to be to cause a result, or to engage in conduct, which is described by a statute defining an offense [citation omitted]. While intent is a subjective state of mind, it may be proved by circumstantial evidence, and the objective evidence of the surrounding circumstances may be examined to determine a person's 'conscious objective.'"

*People v. Santos*, 17 Misc. 3d 520, 529, 841 N.Y.S.2d 852 (2007).

Many other courts have declared that intent usually must be inferred because direct evidence of a defendant's state of mind is so rarely available. See, *e.g.*, *Scudero v. State*, 917 P.2d 683, 688 (Alaska App. 1996); *Cooley v. State*, 271 Ark. 153, 155, 607 S.W.2d 386 (1980); *Chambers v. People*, 682 P.2d 1173, 1176 n.8 (Colo. 1984) (en banc); *State v. Bennett*, 307 Conn. 758, 765-66, 59 A.3d 221 (2013); *Gilliam v. State*, 494 N.E.2d 319, 320 (Ind. 1986); *People v. Shanklin*, 59 A.D.2d 588, 589, 397 N.Y.S.2d 242 (1977); *State v. Pitts*, 259 Or. App. 372, 376, 314 P.3d 324 (2013); *State v. Mann*, 959

16

S.W.2d 503, 518-19 (Tenn. 1997); *State v. Maestas*, 2012 UT 46, ¶¶ 178-79, 299 P.3d 892 (Utah 2012).

Nothing in the statute prompts us to stray from our previous rulings that circumstantial evidence may sustain even the most serious convictions and that it may be used to show intent. See *Griffin*, 279 Kan. at 638; *Graham*, 247 Kan. at 398; *Jones*, 202 Kan. at 43. Consequently, we hold the State may use circumstantial evidence to prove a defendant's conscious objective or desire to engage in the conduct or cause the result of a charged crime and thus meet the mental state requirement defined in K.S.A. 2015 Supp. 21-5202(h).

With that established, we turn to the evidence of Thach's intent, and we conclude the State presented sufficient evidence of his intent in this case. See *Casey*, 199 Kan. at 551 (declaring that in order to constitute substantial or sufficient evidence, circumstantial evidence "need not rise to that degree of certainty which will exclude any and every other reasonable conclusion"). Again, the issue pressed by Thach is whether there was sufficient evidence Xiong died during the commission of an "Aggravated Burglary with the intent to commit an Aggravated Battery."

Here, the jury heard evidence that two of the men at Chea's house were angry about a previous fight involving Xiong, the men discussed "handl[ing]" a problem, the knife was passed around, and Khamvongsa tested its sharpness. Khamvongsa also testified that Louis asked him to declare he was "down" and later warned him that if anybody asked he did not know Louis' name. Louis did not make similar statements to Thach—which suggested Thach intended to participate in the group's actions.

As to whether Thach intended to commit an aggravated battery when he entered Xiong's house, Khamvongsa testified to the objective evidence of surrounding circumstances. He understood Chea's and Louis' anger arose from Xiong boasting and lying about having beaten up some of their friends. He also testified there was no discussion about killing Xiong. These circumstance led Khamvongsa to understand the men just planned to beat up Xiong. And those same objective circumstances could lead a rationale jury to believe beyond a reasonable doubt that Thach shared the same conscious objective of committing an aggravated battery when he entered Xiong's house.

In addition, Khamvongsa testified to Thach's actions, actions which are consistent with an intent to commit a battery in a manner that would cause great bodily harm. Thach manhandled Xiong and, according to at least portions of Khamvongsa's testimony, beat Xiong to the point where Xiong was pretty bruised up. The coroner verified Xiong suffered multiple blunt force injuries before death and had bruises and other significant injuries consistent with a beating. Thach then held Xiong's legs while Louis taunted Xiong with a knife. Khamvongsa testified Louis made a slicing action across Xiong's throat and then turned to Khamvongsa and offered the knife. Khamvongsa then turned away and at that point heard what he thought was the gushing of blood. Consistent with this description, the coroner explained she found multiple incised wounds caused by a knife or other sharp object and one deep wound that went through Xiong's airway and penetrated back to his spine. Given the beating and the multiple knife-like wounds, a jury could conclude Thach entered the house intending to participate in a beating and the taunting with the knife—an action by which serious bodily injury, disfigurement, or death can be inflicted.

18

Thus, construing the evidence in the light most favorable to the State, there was sufficient circumstantial evidence that Thach entered Xiong's home with the intent to commit aggravated battery. Based on this evidence a rational factfinder could have found Thach guilty beyond a reasonable doubt of that crime, a crime which the court instructed the jury must be found to exist in order to convict Thach of aggravated burglary and felony murder based on the inherently dangerous crime of aggravated burglary. See *State v. Frye*, 294 Kan. 364, 374-75, 277 P.3d 1091 (2012); *State v. Hall*, 292 Kan. 841, 858-59, 257 P.3d 272 (2011); *State v. Scott*, 271 Kan. 103, 107, 21 P.3d 516 (2001). Thach's sufficiency argument fails.

ISSUE 2: *The State's presentation of two theories of first-degree murder did not violate Thach's due process rights.*

Thach next argues the State violated his due process rights by presenting two opposing theories of first-degree murder—premeditated first-degree murder and felony murder. We must decide at the outset whether to even consider Thach's constitutional argument.

Thach admits he did not raise his due process issue before the district court. In contrast to his constitutional argument regarding K.S.A. 2015 Supp. 21-5202, this time he points to two of the recognized exceptions for allowing consideration of a constitutional issue for the first time on appeal: "The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case"; and "consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights." *State v. Spotts*, 288 Kan. 650, 652, 206 P.3d 510 (2009); see *Godfrey*, 301 Kan. at 1043 (requiring parties asserting a constitutional claim for the

19

first time on appeal to invoke an exception). And he makes a sufficient argument that the issue is one of law to satisfy the requirements of Kansas Supreme Court Rule 6.02(a)(5) (requiring the complaining party to provide an explanation for why an issue not raised below is nonetheless properly before the court).

We will therefore consider Thach's argument and exercise unlimited review over his due process claim. See *Johnson v. State*, 289 Kan. 642, 649, 215 P.3d 575 (2009) ("The question of whether an individual's constitutional rights have been violated is a question of law over which an appellate court exercises unlimited review.").

We have previously held that "'[p]remeditated and felony murder are not separate, distinct offenses but are two separate theories under which the crime of first-degree murder may be committed.'" *State v. Morton*, 277 Kan. 575, 579, 86 P.3d 535 (2004) (quoting *State v. McKinney,* 265 Kan. 104, Syl. ¶ 1, 961 P.2d 1 [1998]). And in *Morton*, this court relied on the United States Supreme Court's holding that presenting alternative theories of premeditated and felony murder does not offend due process. *Morton*, 277 Kan. at 581 (citing *Schad v. Arizona*, 501 U.S. 624, 630-45, 111 S. Ct. 2491, 115 L. Ed. 2d 555 [1991]).

Subsequently, in numerous cases we have allowed alternative jury instructions and verdicts, holding the jury may receive instructions on both theories although a defendant may not be sentenced to both premeditated murder and felony murder for a single killing. See, *e.g.*, *State v. Young*, 277 Kan. 588, 594-95, 87 P.3d 308 (2004); see also *State v. Thomas*, 302 Kan. 440, 441, 353 P.3d 1134 (2015) (noting the defendant was charged with one count of first-degree murder under alternative theories of premeditation and felony murder, and upholding the defendant's conviction even though the jury could not

20

agree as to which theory applied in the case); *State v. Jackson*, 223 Kan. 554, 556-57, 575 P.2d 536 (1978) (State may charge alternative theories of first-degree murder and need not elect a single theory). As these cases establish, premeditated murder and felony murder are not inherently contradictory but rather separate theories of first-degree murder.

Our caselaw thus stands squarely at odds with Thach's position, and Thach, for his part, points to no case where we have required the State to pick either premeditated first-degree murder or felony murder when prosecuting a single defendant. Instead, Thach analogizes to cases where courts have prohibited the State from using inherently factually contradictory theories when trying *codefendants* for the same crime. Thach has failed to convince us the analogy holds, but in any event his authority does not support his argument before this court. See, *e.g.*, *Smith v. Groose*, 205 F.3d 1045, 1052 (8th Cir. 2000) ("To violate due process, an inconsistency must exist at the core of the prosecutor's cases against defendants for the same crime.").

CONCLUSION

For the foregoing reasons, we affirm Thach's convictions.

Affirmed.

21