IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 118,361

STATE OF KANSAS,
*Appellee*,

v.

SAMUEL VONACHEN,
*Appellant.*

SYLLABUS BY THE COURT

1.

Generally, an appellate court does not address issues for the first time on appeal, but there are limited exceptions within defined parameters.

2.

An appellant has the burden to designate a record sufficient to establish a claimed error. Without an adequate record, the appellant's claim of error fails.

3.

When a criminal defendant is a juvenile, courts must exercise the greatest care in assessing whether the juvenile's incriminating statements to law enforcement were voluntary. In deciding that, five nonexclusive factors are considered: (a) the juvenile's age, (b) the length of questioning, (c) the juvenile's education, (d) the juvenile's prior experience with police, and (e) the juvenile's mental state.

4.

K.S.A. 2012 Supp. 38-2347(e) directs a district court to consider eight statutory factors when deciding whether to authorize an adult prosecution of a juvenile. On appeal,

1

the court's ruling is subject to a dual standard of review. Its factual findings are evaluated for substantial competent evidence; and its ultimate legal assessment of those eight factors, based on its factual findings, is reviewed for abuse of discretion.

5.

K.S.A. 2012 Supp. 38-2347(e) not only provides specific factors to be considered when deciding whether to authorize an adult prosecution of a juvenile, it clarifies, "The insufficiency of evidence pertaining to any one or more of the factors listed in this subsection, in and of itself, shall not be determinative of the issue." This means the Legislature intended a holistic analysis and not simply a numerical calculation of how many factors weigh for or against the juvenile.

Appeal from Reno District Court; TRISH ROSE, judge. Opinion filed December 4, 2020. Affirmed.

*Christina M. Kerls*, of Northeast Kansas Conflict Office, argued the cause and was on the brief for appellant.

*Andrew R. Davidson*, senior assistant district attorney, argued the cause, and *Keith Schroeder*, district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BILES, J.:  When he was 14 years old, Samuel Vonachen burned down his family home while his parents and little sister were sleeping inside. His mother and sister died. The State charged Samuel with two counts of first-degree murder, one count of attempted first-degree murder, and one count of aggravated arson. After being certified to be tried as an adult, he was convicted as charged. In this direct appeal, he advances seven challenges to reverse those results. We reject each one and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Shortly after midnight on September 26, 2013, Samuel's father, Steve Vonachen, woke up to a smoke alarm. He went to the top of the stairs, saw fire, and went down to the kitchen to call for help. The phone did not work, so he tried to get back upstairs but the fire's spread prevented that. He ran outside, thinking his wife Karla, 14-year-old son Samuel, and 11-year-old daughter A.V. were still inside.

A passerby noticed the house fire and saw Steve running out. They called 911 and kept Steve from going back inside. Firefighters found Karla and A.V. unresponsive in a bedroom. Samuel was missing.

Around 2 a.m., a police officer saw a young man walking towards the Vonachen home. The officer approached and learned the young man was Samuel. The officer asked him what he had been doing the last two hours. Samuel answered, "[J]ust been walking around." Emergency medical personnel noticed Samuel had a rapid heart rate and high blood pressure. Officer Chris Flynn took Samuel to a hospital.

When examined at the hospital, there were no burn marks on Samuel's clothing, skin, hair, or face. His jeans appeared to be new because they still had the clear strip down the pant leg showing the size. A distinct gasoline odor caught Flynn's attention because a gas can was found on the porch and Steve had said the fire traveled in a line up the stairs. Samuel's clean appearance contrasted with Steve's. According to an examining nurse, Steve was "[j]ust completely covered in soot."

Detective Dean Harcrow briefly interviewed Samuel in his father's presence while at the hospital. After that, Samuel was released to Steve, who took him to his

3

grandparents' house and then drove back to check on Karla, who was still alive. Later that same day, Steve went to the police station, where he listened to a 911 recording and recognized Samuel's voice.

Samuel was brought to the police station. Two detectives interviewed Samuel while his father sat next to him. Samuel waived his *Miranda* rights. About half an hour into the interview, Steve left the room at Samuel's request. Samuel then confessed "how he burnt the house down with his family inside" and described how he did it. He drew a diagram of the fire and the pour pattern he made with the gasoline.

Autopsy reports showed Karla and A.V. died of smoke inhalation and thermal injuries. The State charged Samuel with two counts of first-degree murder, one count of attempted first-degree murder, and one count of aggravated arson in the juvenile court. The district court granted the State's motion to authorize adult prosecution.

A jury convicted Samuel of all counts. The court sentenced him to life in prison with no possibility of parole for 25 years for the two first-degree murder convictions, 155 months' imprisonment for the attempted first-degree murder conviction, and 59 months' imprisonment for the aggravated arson conviction. The court ordered the sentences to run concurrent to each other.

Samuel directly appeals to this court. He argues: (1) our state's approach to the insanity defense violates his rights under the Eighth and Fourteenth Amendments to the United States Constitution; (2) a court order compelling him to produce personal writings made at a detention center while awaiting trial violated his rights under the Fifth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights; (3) the court erred when it denied his motion to suppress the incriminating statements made to police; (4) prosecutorial error occurred during closing arguments; (5)

4

cumulative error adversely affected his right to a fair trial; (6) the court's certification to try him as an adult violated *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) (prohibiting judicial fact-finding that enhances punishment); and (7) the court abused its discretion in applying the factors set out in K.S.A. 2012 Supp. 38-2347(e) to authorize a juvenile's adult prosecution.

Jurisdiction is proper. See K.S.A. 60-2101(b) (Supreme Court jurisdiction over direct appeals governed by K.S.A. 2019 Supp. 22-3601); K.S.A. 2019 Supp. 22-3601(b)(3)-(4) (life sentence and off-grid crime cases permitted to be directly taken to Supreme Court); K.S.A. 2019 Supp. 21-5402(b) (first-degree murder is off-grid person felony).

### THE INSANITY DEFENSE CLAIMS

For the first time on appeal, Samuel argues he was unconstitutionally denied an ability to pursue what he characterizes as a traditional insanity defense because K.S.A. 2019 Supp. 21-5209 sets out a different approach of how to use mental disease or defect as a defense. The statute declares, "It shall be a defense to a prosecution under any statute that the defendant, as a result of mental disease or defect, lacked the culpable mental state required as an element of the crime charged. Mental disease or defect is not otherwise a defense." K.S.A. 2019 Supp. 21-5209. He claims the statute violates his rights under the Eighth and Fourteenth Amendment to the United States Constitution.

These arguments were not raised with the district court, so we must decide whether they can be considered now. Courts generally do not address constitutional issues for the first time on appeal. *State v. Harris*, 311 Kan. 371, Syl. ¶ 1, 461 P.3d 48 (2020) ("Generally, an appellate court does not address issues for the first time on appeal, but there are limited exceptions within defined parameters."). For the reasons discussed,

5

we hold his Eighth Amendment claim is not preserved, and we decline to invoke the exceptions to our general rule as it concerns the Fourteenth Amendment claim.

*Additional facts*

Prior to trial, Samuel filed a notice of mental disease or defect. The district court ordered two licensed psychologists to evaluate his mental status. They prepared a report using psychological test material, objective data, behavioral observations, and interviews, as well as police reports, court and detention facility records, Samuel's confession video, and audio recordings made with Samuel at the scene, while being taken to the ER, and when interviewed at the hospital.

The psychologists diagnosed Samuel with "Other Specified Personality Disorder" and "AD/HD, combined type." They noted his "mental status can best be characterized as manifestation of youth psychopathy, or antisocial personality." The sole reason why the diagnosis indicated "Other Specified Personality Disorder" was because Samuel did not meet the age criteria—18 or older at the time of the evaluation—to be diagnosed for antisocial personality disorder.

Their findings included:  "his (pre-arrest) family relationships as unremarkable, with no indications of chronic relational problems, serious conflict, or abuse"; he "has expressed little to no emotion about the deaths of his sister and mother"; he has "been an above average to excellent student with no significant behavior issues at school"; "[h]e truly believes he is literally superior to everyone"; "[h]e is impulsive and he is deceitful"; he "clearly appears to have intended to engage in the actions that led to the death of his mother and sister"; and his "plan was carried out impulsively and seemingly without rational cause" but "his initial goal was achieved." The report explained, "Like most kids his age . . . , they simply do not think through consequences . . . [and, therefore, Samuel]

6

thought through setting the fire, but he simply did not think through what would or should follow afterward."

At trial, Trevor Patton, one of the court-appointed psychologists, testified that he used "the Weschler [*sic*] Intelligence Scale for Children" and found Samuel had "a full scale IQ score of 127 which is superior at the 96th percentile compared to same age peers." He did not find "any indicator . . . of any kind of cognitive impairment," but instead observed Samuel "had a pretty strong vocabulary, seemed to be at least bright, and . . . provided a pretty good account of those specific details regarding his history, schooling, [and] family relationships." Patton noted there was "no history of any kind of trauma or abuse." He discovered Samuel had "some history of ADHD or attention deficit hyperactivity disorder treatment that began in early childhood and then . . . around middle school the defendant was no longer treated" since the treatment became unnecessary. He explained that ADHD is a "very common" affliction to children.

Patton said Samuel's personality disorder and his ability to form the intent to commit a crime are "completely different question[s]." The personality disorder simply indicated Samuel could "have a callous disregard for the welfare of others and be willing to sacrifice others for their own gain." But that did not affect his "capacity to form the intent." They are "two separate concepts." Patton concluded Samuel did not have any "mental disease or defect that rendered him incapable of forming the intent to commit these crimes."

Shelby Evans, the other court-appointed psychologist, also testified. Her opinion of Samuel's mental status was the same as Patton's. She added Samuel was "generally cooperative," "talkative," and "engaged in the process." "His mental status was good, he's alert, [and] he's oriented. He knows what's going on." Samuel had no "problems with memory. Even as he's talking about the events that led up to him being in detention he

7

was very clear, had plenty of detail describing those." Evans noted when she asked Samuel if he felt guilty about the situation, he was "'not sure how guilty [he] should feel.'" He exhibited no "remorse for what he had done." When asked about his parents, he used the same three words to describe both: "funny, smart and loving." His description of A.V. was "girlie, artsy, like[d] to play with dolls."

Evans explained that people with antisocial personality disorder have a disregard for others, and lack meaningful attachments and caring for other people, whether they be friends or family. She found no mental disease or defect and concluded Samuel was "definitely . . . capable of forming the intent to kill" and "to premeditate . . . murder." Evans emphasized she had "no doubt at all" in her "mind that he's capable of those things."

Kathleen Heide testified on Samuel's behalf. She earned her B.A. in psychology and an M.A. and Ph.D. in criminal justice. In her opinion, the most appropriate diagnosis for Samuel appeared to be "Unspecified Dissociative Disorder." She said Samuel lacked the mental state to intentionally kill or to premeditate the killing of others. Heide said Samuel's case did not meet any specific type of dissociative disorder and that was why her diagnosis was termed "unspecified."

Both Patton and Evans reviewed Heide's evaluation and disagreed with her conclusions. Their rebuttal stated: "Regarding the possibility of any and all other potential psychological disorders that might account for Sam's behavior on the night of [the fire], the current evaluation simply produces no evidence of any other mental disease, including an Unspecified Dissociative Disorder." Patton described dissociative disorder as "controversial" in the psychology field, noting "a large group of professionals" do not believe in its existence.

8

According to Patton, paralysis is a typical form of dissociation. For instance, a rape victim, a combat soldier, and "a six-year-old child who has been beaten badly" can disassociate briefly and become paralyzed, not functioning or processing. They have no memory of the event, which was not the case for Samuel. Dissociation is "a defense mechanism to protect yourself from physical and/or psychological pain," so it is "always" triggered by a "traumatic event." Patton found no "evidence whatsoever in the defendant's background or family life or home life or school life or anything that was a significant traumatic triggering event."

*Standard of review*

Constitutional claims are questions of law subject to de novo review. *State v. Coleman*, 312 Kan. 114, 117, 472 P.3d 85 (2020).

*Preservation*

As mentioned, neither Samuel's Eighth nor Fourteenth Amendment issues were raised with the district court—a point he concedes. But he argues there are exceptions to the general rule against considering these new issues that we should invoke. He contends: (1) his newly asserted Eighth Amendment claim presents only a question of law that would be finally determinative of the case; and (2) considering his Fourteenth Amendment claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights. See *Harris*, 311 Kan. at 375 (explaining general exceptions to the preservation rule an appellate court may invoke in its discretion).

But his Eighth Amendment claim is not a pure legal question and would not be finally determinative of the case because a more complete evidentiary record would need to be developed. Samuel did not proffer any evidence at trial that he met the requirements

9

of any test for insanity that he lacked the ability to know right from wrong, i.e., moral capacity. And while his defense expert testified he suffered the unspecified dissociative disorder and was unable to form the required intent, neither she nor the State's experts offered any opinion whether he was insane under any test. All three focused solely on whether Samuel had the ability to form the intent to commit the charged offenses.

This means additional facts are needed before Samuel's Eighth Amendment claim could be decided. Indeed, his proposed remedy for this asserted error is to remand the case for a new trial to pursue the insanity defense as he now envisions it. We hold the asserted Eighth Amendment claim is not subject to an exception and was not preserved for appellate review.

As for the due process claim under the Fourteenth Amendment, the second exception would apply—if we choose to invoke it. But there is no reason to do so in this instance because Samuel conceded at oral argument that this claim was recently decided against him in *Kahler v. Kansas*, 589 U.S. ___, 140 S. Ct. 1021, 1037, 206 L. Ed. 2d 312 (2020) (holding due process does not mandate that a state adopt a particular insanity test, and therefore Kansas' abolishment of its previous insanity defense does not violate the federal Constitution; noting Kansas' defense-of-lack-of-mental-state statute did not completely abolish the insanity defense "turning on a defendant's ability to recognize that his crime was morally wrong," but rather it adopted a different type of the insanity defense which "takes account of mental health at both trial and sentencing"); see *State v. Bethel*, 275 Kan. 456, 66 P.3d 840 (2003).

Samuel offers no new reason to reconsider the due process issues fully discussed in *Kahler* and *Bethel*, so we decline to consider the question further.

Samuel argues the district court violated his rights under the Fifth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights by granting the State's motion to compel production of his personal writings made before trial while at a detention center. But once again we have a preservation problem because our appellate record does not include the lower court's actual rulings on the motion or the writings in question. We hold this issue is not properly presented for appellate review.

*Additional facts*

After Samuel filed his notice of intent to assert a defense of mental disease or defect, the district court ordered Patton and Evans, the two licensed psychologists, to evaluate Samuel's mental status. To comply, they asked to examine Samuel's writings in journals he kept while in detention. Patton explained the need for this:

> "Historically, such personal writings are commonly used in the context of forensic examination. These materials are critically necessary in order to respond to the ORDER OF EXAMINATION and '. . . whether the defendant had the intent to commit the crimes charged.' These written materials are deemed to be directly pertinent to the assessment of the respondent's mental status over time, and are of paramount importance for specifically assessing the respondent's fundamental attitudes and motives in the interest of responding directly to the aforementioned Court Order."

The detention center's director described Samuel's writings as follows:

> "During Sam's stay . . . between his initial admission on 9/26/2013 and his dismissal on 8/13/2015, *he had journals that he was writing in and drawing in that contained unknown information*. . . . Sam was also writing a novel on a school computer. . . . According to [a] staff member . . . who read a major part of the novel, the novel could

11

be best characterized as fiction/nonfiction with some parallels to his life experiences. There were references in the book relating to people dying tragically. After Sam's dismissal . . . the novel was deleted from the school's computer. All of Sam's personal possessions, including the above referenced journals and the printed novel, were transferred to his attorney shortly after his release from the juvenile facility . . . ." (Emphasis added.)

The State moved to compel production of these writings, primarily relying on K.S.A. 22-3219(2) (defendant who files notice of intention to assert defense that defendant lacked the mental state required as an element of the offense charged as a result of mental disease or defect submits and consents to such orders as the court may make requiring mental examination). Samuel opposed the motion under the Fifth Amendment and its parallel provision in our state Constitution. The court ordered the defense to provide the notebooks to the court, and we are advised the court gave them to the State for delivery to the psychologists.

But the district court's actual decision is not included in the record. The most we know about it comes from a motion to stay the order's execution. There, Samuel quoted the court's decision as follows:

"On January 27, 2016, at 2:19 pm the Court issued its ruling through an email which stated

"I have . . . reviewed the box of material delivered by defense counsel containing defendant's writings, drawing and letters. . . . I do not find anything that should be excluded and therefore the box is available to be picked up [by] the District Attorney for use by Dr. Patton and Dr. Evans . . . to perform [their] evaluation. My in court ruling on Monday, January 25, is affirmed."

12

Curiously, the record reflects no "in court ruling" during the January 25 hearing, as described, nor is the referenced email a part of the record.

The district court held another hearing in February 2016. The issue was whether to grant a motion to stay for Samuel to pursue an interlocutory appeal seeking review of the district court's earlier ruling. The district court granted the stay, but the record does not show what may have happened from any interlocutory appeal. Further confounding our review, there is no pinpoint reference to the record in either party's brief locating the district court's final ruling allowing review. Nevertheless, it is obvious from the trial transcript the psychologists received documents and used them in their evaluations.

To recap, our appellate record does not contain: (1) the original email order, although some text is quoted in the motion to stay; (2) the final order that eventually granted the State's motion; or (3) the journals themselves.

*Waiver*

It is "the well-established rule that an appellant has the burden to designate a record sufficient to establish the claimed error. Without an adequate record, an appellant's claim of alleged error fails." *State v. Swafford*, 257 Kan. 1099, 1101, 913 P.2d 196 (1996); see also Supreme Court Rule 6.02(a)(4), (5) (2019 Kan. S. Ct. R. 34) (appellant has the burden to furnish a sufficient record to support the claims of error; appellant's claims of error must be supported with specific citations to record on appeal).

The email's language quoted in Samuel's motion to stay merely states the court found nothing "'should be excluded'" and ordered disclosure of the materials to the State's experts. But to determine whether the court erred by ordering production, this court must first determine if Samuel's notebooks fall within the asserted constitutional protection.

13

See *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 189, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (2004) ("To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled."). And without knowing the contents of the writings and the district court's factual findings and conclusions of law on this issue, no analysis can meaningfully examine the lower court's ruling.

We decline to consider the matter further. See *State v. Sisson*, 302 Kan. 123, 128, 351 P.3d 1235 (2015) (party claiming error has burden of designating a record affirmatively showing error; without such a record, appellate court presumes action of trial court was proper).

THE MOTION TO SUPPRESS INCRIMINATING STATEMENTS

Samuel asserts the district court erred by denying his motion to suppress his incriminating statements to police. He claims his statements were not made voluntarily. We affirm the district court because substantial competent evidence supports its decision.

*Additional facts*

Samuel's seven-minute interview with Detective Harcrow at the hospital took place around 4 a.m. After that, Steve took Samuel to his grandparents' house. Roughly 15 hours later (about 7 p.m.), police officers went to the grandparents' house and brought Samuel to the police station. At 7:18 p.m., Detectives Scott Carlson and Paul Sack began interviewing Samuel with his father present. The entire interview lasted an hour and 16 minutes.

At the outset, Carlson read the *Miranda* rights to Samuel, adding: "for some reason if you don't understand something that I read to you, make sure you . . . tell me

14

. . . . I will be more than happy to explain it to you." Samuel waived his rights and agreed to speak with the detectives. Initial questions related to Samuel's activities the day before the fire including school, family, and home. Samuel said everything was "normal."

When asked how he found out about the fire, Samuel answered he was awake and heard the smoke alarm, went downstairs, and saw smoke and fire. He ran through the front door with his cellphone, sunglasses, and a blanket. He called 911 and gave the home address but could not remember if he identified himself.

Carlson played the 911 audio recording. It reflected that after reporting the address, Samuel claimed it was not his house. The dispatcher asked, "Can you bang on the door?" He said, "No." Before hanging up, he told the dispatcher his name was "Dominic Seeth." Samuel acknowledged being the caller. Carlson asked who "Dominic Seeth" was, and Samuel said it was just a made up character.

Samuel also claimed he chased someone he said started the fire. Sack confronted him with evidence showing Samuel's inconsistent behaviors. For instance, Sack showed a photo of a bass guitar found the morning of the fire in a nearby park that Steve identified as his son's. Sack said removing the guitar before the fire, being fully dressed, taking his sunglasses with him at night, lying when talking to the dispatcher, turning off his phone after the 911 call, and disappearing for two hours were strange under the circumstances. At that point—36 minutes into the interview—Samuel asked his father to leave the room.

Once Steve left, Samuel immediately changed his attitude and became very cooperative. He abruptly leaned forward and said: "I put the gas can there. I burned down the house. I did it because I wanted people to die." The detectives asked why. Samuel said "because human life is worthless." He said everyone, including his family and the detectives sitting in front of him, were awful—except himself.

15

Samuel then described how he set the fire. He said he waited until his family went to bed, put his guitar and blanket out on the porch, got the gas can from the garage, and spread the gasoline around the house. He said it did not matter to him who died or who lived, but he wanted "people" to die. Samuel diagramed how he patterned the gas pour. And he said he went back over the area with the gas twice because he wanted to do a "thorough job." After he started the fire, he "just walked away" with his belongings.

Carlson asked again about the 911 call: "Were you panicked when you did that? . . . You were kinda breathing heavy." Samuel said his hurried voice was just him "acting." Samuel also said he had been thinking about lots of things for a while and put those thoughts in a notebook in his room. He said he did not specifically plan to start the fire that night, but as soon as he thought of doing it, he carried it out right away. He said his mother and father were "great parents," but he was not sorry for the fire's results.

Before trial, Samuel moved to suppress his statements, claiming they were made involuntarily. The district court denied the motion in a written order. It states in relevant part:

> "In determining whether a defendant's confession is voluntary the essential inquiry is whether the statement was the product of the free and independent will of the accused. In making this determination the court considers the following factors: (1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused to communicate on request with the outside world; (4) the accused's age, intellect and background; (5) the fairness of the officers in conducting the interrogation; and (6) the accused's fluency with the English language. *State v. Morton*, 286 Kan. 632, 186 P.3d 785 (2008).
>
>     . . . .

16

"The court has reviewed the videotape of the interrogation. Defendant was advised of his rights and signed a written waiver. While the interrogation occurred in the evening of the same day of the early morning fire, defendant did not appear to be groggy or ill. Defendant's father was present at the interrogation until defendant asked him to leave. The defendant was 14 years old and was able to communicate fluently. The interrogation did not exceed a reasonable length of time. The officers did not employ unfair or coercive tactics in conducting the interview.

"Given the totality of the circumstances the court concludes the statements of defendant at the law enforcement center were voluntary."

At trial, counsel renewed the objections to these statements, so the issue is properly preserved. *State v. Brown*, 307 Kan. 641, 645, 413 P.3d 783 (2018) (contemporaneous objection is required to preserve evidentiary issue for appeal); K.S.A. 60-404.

*Standard of review*

Appellate courts employ a dual standard when reviewing a district court's decision on a suppression question challenging a confession's voluntariness. First, the decision's factual underpinnings are reviewed for substantial competent evidence standard. Next, the court's legal conclusions drawn from those facts are assessed de novo. Appellate courts do not reweigh evidence, assess witness credibility, or resolve conflicting evidence. *State v. Gibson*, 299 Kan. 207, 215-16, 322 P.3d 389 (2014).

*Discussion*

When challenged, the State has the burden to prove by a preponderance of the evidence that a defendant's incriminating statements were freely and voluntarily given. And to determine that, a trial court typically looks at the totality of the circumstances

surrounding the statements and considers the following nonexclusive factors: (1) defendant's mental condition; (2) the interview's manner and duration; (3) defendant's ability to communicate on request with the outside world; (4) defendant's age, intellect, and background; (5) the officer's fairness in conducting the interview; and (6) defendant's fluency with the English language. *Gibson*, 299 Kan. at 214.

And when the defendant is a juvenile, "courts must exercise the greatest care in assessing whether the juvenile's inculpatory statement to law enforcement was voluntary." 299 Kan. at 215. In deciding that, five nonexclusive factors are considered, commonly referred to as the *Young* factors. See *State v. Young*, 220 Kan. 541, 546-47, 552 P.2d 905 (1976). They are: (1) the juvenile's age, (2) the length of questioning, (3) the juvenile's education, (4) the juvenile's prior experience with police, and (5) the juvenile's mental state.

In Samuel's case, the district court listed the typical six factors in its written order, rather than the more particular *Young* factors. But that is not an insurmountable problem on review for at least three reasons. First, *Young*'s five factors and the six typical factors overlap. *Gibson*, 299 Kan. at 215. Second, both sets of factors are nonexclusive, and those factors are not to be weighed against one another. Regardless, the important concern remains the totality of the circumstances surrounding the incriminating statement. 299 Kan. at 215. Third, a trial court need not explicitly consider the *Young* factors on the record in deciding voluntariness. *State v. Davis*, 268 Kan. 661, 675, 998 P.2d 1127 (2000).

In Samuel's case, the district court made explicit findings encompassing *Young*'s first and second factors: Samuel was 14 years old, and the interview lasted a reasonable length of time. These findings are supported by substantial competent evidence. As to the remaining factors, the record shows Samuel's education and mental state support the

court's ruling. With regard to the fourth factor, Samuel had no prior experience with the police, but that does not seem to have impacted his voluntary confession. For example, his brazen demeanor in telling the detectives they were "awful" shows he certainly was not disadvantaged by a lack of prior police experience.

K.S.A. 38-2333(a) provides that when a juvenile is less than 14, a confession is not admissible unless it "was made following a consultation between the juvenile's parent or attorney." Subsection (b) further provides that "[w]hen a parent is the alleged victim or alleged codefendant of the crime," the juvenile's confession is not admissible unless it "was made following a consultation between the juvenile and an attorney, or a parent who is not involved in the investigation of the crime." But the statute does not apply in Samuel's case because he was 14 when he committed the crimes. Nevertheless, the defense makes a point in arguing that Samuel's father was present for the first 36 minutes, even though he was likely both a suspect and a victim and might not have been "looking out for Sam's interests."

But the father's presence does not appear to have prompted an involuntary confession. In fact, Steve's presence appears to have kept Samuel from confessing because when his father was present, most of Samuel's answers to the detectives were "I don't know" or "I don't remember." And Samuel suddenly discussed in detail how he set the fire once his father left the room. It is difficult in this instance to give too much consideration to the father's presence.

Given the totality of the circumstances, the district court did not err in concluding Samuel's incriminating statements were voluntary and freely given. See *State v. Makthepharak*, 276 Kan. 563, 567, 78 P.3d 412 (2003) ("'If there is substantial competent evidence to support the trial court's findings that the defendant voluntarily, knowingly, and intelligently waived his rights, such findings will not be disturbed on appellate

19

review.'"). That said, the better practice for a trial court faced with determining the voluntariness of a juvenile confession is to explicitly consider the *Young* factors when making that determination. *Makthepharak*, 276 Kan. at 567.

PROSECUTORIAL ERROR CLAIMS

Samuel argues the prosecutor improperly shifted the burden of proof to the defense by misstating "the law regarding what the jury had to find regarding [his] defense of mental disease or defect." He asserts this deprived him of his fair trial right under the Fourteenth Amendment to the United States Constitution. We hold there was no error.

*Additional facts*

The prosecutor began his closing argument by focusing on the evidence showing Samuel premeditated the killing of his family, or at least he did so intentionally and knowingly:

> "[Samuel] told the police what happened that night. The statement, 'I burned the house, I wanted people to die,' and he didn't care who, but he wanted people to die. Shows you his intent, shows you his attitude the entire time. . . . He sat across that table from Detective Carlton and Detective Sack, leaned up there with his elbows and said, 'I did it, I burned them.' 'Why?' 'Because I wanted to.' . . . He took his items out of the house because he didn't want to get them burned because he knew what he was going to do . . . ."

Then, the prosecutor discussed the experts' testimony about his mental status:

> "[T]he [two licensed] psychologists . . . said that in order to disassociate you have to have a fundamental trauma and they offered no evidence of that. *[The defense's expert] just say[s] it just happened, okay? No evidence of it* because dissociation is a protective mechanism, as you heard, that requires some kind of substantial trauma. The only thing

20

Dr. Heide offers is lacked supervision and he might have been bullied at school. . . . *[Heide is] not licensed here. . . .* [I]f you're looking for a reason why he killed his mother and sister, it's as simple as I wanted to do it. . . . So he did it. He clearly thought about it. He clearly considered it. He clearly planned it. [F]rom the moment he waited for his parents to go to sleep until he's pouring the gasoline . . . ." (Emphases added.)

After these statements, the prosecutor explained what the jury had to do to find Samuel not guilty based on the defense theory. The italicized statements below are those complained about in this appeal.

"The defendant wants you to excuse him for [the] murder of his sister and his mother because he had some kind of claimed mental disease or defect. Do you see that? Is that evidence of that? Is there evidence that the defendant didn't know what he was doing? *Because after all, ultimately in the instructions you have to find in order to find that you have to find that because of that defect he was incapable of forming the intent to kill or premeditated murder or to knowingly commit arson. You have to find he's incapable of that.* Do you believe that based on his conduct that night? . . . In the end, remember what he said on the tape. In the end the statement that counts most is, 'I burned the house, I wanted people to die.' Doesn't that say it all? Really? 'I wanted people to die.' That's why he did it. Find him guilty as he's charged." (Emphasis added.)

*Standard of review*

A court follows a two-step analysis in addressing a prosecutorial error claim. First, it decides whether any error occurred. Second, if there is error, the court considers prejudice to determine whether the error was harmless. For the first step, the court looks at the prosecutorial statement complained about and decides if it falls outside the wide latitude afforded the prosecutor in conducting the State's case and attempting to obtain a conviction in a manner that does not offend the defendant's fair trial rights under the Fourteenth Amendment. A defendant can establish the first prong by demonstrating the

prosecutor misstated the law or argued factual assertions with no evidentiary foundation. *State v. Patterson*, 311 Kan. 59, 70, 455 P.3d 792 (2020).

*Discussion*

It is error for a prosecutor to attempt to shift the burden of proof to the defendant or to misstate the legal standard of the burden of proof. *State v. Blansett*, 309 Kan. 401, 414, 435 P.3d 1136 (2019). Samuel alleges the prosecutor's remark—telling the jury that "to find in favor of Sam, it had to find that he was incapable of forming the intent to kill or knowingly commit arson"—was a misstatement of the law.

But Samuel misconstrues what happened in the State's closing. The prosecutor simply pointed out no evidence suggested Samuel was incapable of forming the intent to commit the charged crimes. "[A] prosecutor does not shift the burden of proof by pointing out a lack of evidence to support a defense." *State v. Williams*, 299 Kan. 911, 940, 329 P.3d 400 (2014); see also *State v. Stone*, 291 Kan. 13, 17-18, 237 P.3d 1229 (2010) (holding prosecutor did not attempt to shift burden of proof by arguing defendant had significant "'obstacles to overcome'"). And after this, the prosecutor correctly noted what the jury had to do to find Samuel incapable of forming criminal intent. See *State v. Thomas*, 307 Kan. 733, 744, 415 P.3d 430 (2018) ("Appellate courts consider the prosecutor's comments in the context in which they were made rather than in isolation.").

The statement at issue substantially repeated the instructions given to the jury, which were not challenged by Samuel. Instruction No. 14 stated, "Evidence has been presented that the defendant was afflicted by mental disease or defect at the time of the alleged crime. The defendant is not criminally responsible for his acts if because of mental disease or defect the defendant lacked the intent or the premeditation to commit murder" and he "lacked the knowingly mental state to commit Aggravated Arson." And

22

Instruction No. 15 noted that if the jury found Samuel "not guilty solely because [he], at the time of the alleged crime, was suffering from a mental disease or defect which rendered [him] incapable of possessing the required culpable mental state, then [he] is committed to the State Security Hospital for safekeeping and treatment until discharged according to law."

Contrary to Samuel's argument, the prosecutor's statement simply summarized Instruction Nos. 14 and 15. And any possible ambiguity about which party bore the burden of proof was plainly explained in Instruction No. 13 that stated: Samuel "raises mental disease or defect as a defense. Evidence in support of this defense should be considered by you in determining whether the State has met its burden of proving that Samuel Vonachen is guilty. The State's burden of proof does not shift to Samuel Vonachen."

We hold there was no prosecutorial error.

## CUMULATIVE ERROR

Samuel claims cumulative error deprived him of a fair trial. But based on our holdings, there is no error to accumulate. See *State v. Williams*, 308 Kan. 1320, 1335, 429 P.3d 201 (2018).

## SAMUEL'S ADULT PROSECUTION

Samuel asserts next that when the district court made its factual findings supporting the decision to authorize his prosecution as an adult, it increased his potential punishment in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). He claims if he had been adjudicated as a juvenile offender for the

23

first-degree murders, his punishment would not have extended past his 23rd birthday. See generally K.S.A. 2012 Supp. 38-2304 (jurisdiction for juvenile case). His assertion is that the State subjected Samuel to a life sentence by prosecuting him as an adult. See K.S.A. 2019 Supp. 21-6806(c) (mandatory life sentence for first-degree murder). And he claims a constitutional problem occurs because the factual findings necessary to certify an adult prosecution violate *Apprendi* when those findings are made by a judge.

*Preservation*

Once again, we have a preservation problem. Samuel concedes his *Apprendi* issue was not raised with the district court, so it would be necessary to invoke an exception to the general rule for this court to review the unpreserved claims. *State v. Harris*, 311 Kan. 371, 375, 461 P.3d 48 (2020) (appellate courts generally do not consider an unpreserved claim, but acknowledging potential exceptions when a claim implicates purely legal questions and involves defendant's fundamental rights).

In this instance there is no need to invoke an exception. Samuel acknowledges this court has consistently rejected the same argument in *State v. Potts*, 304 Kan. 687, 374 P.3d 639 (2016), *State v. Tyler*, 286 Kan. 1087, 191 P.3d 306 (2008), *State v. Mays*, 277 Kan. 359, 85 P.3d 1208 (2004), *State v. Kunellis*, 276 Kan. 461, 78 P.3d 776 (2003), and *State v. Jones*, 273 Kan. 756, 47 P.3d 783 (2002). And other than asserting our prior decisions were wrong, Samuel does not advance any argument about why they were wrong. Given that, we will not invoke an exception to the general preservation rule. See *State v. Albright*, 273 Kan. 811, 813, 46 P.3d 1167 (2002) (declining to reconsider the matter since it was unpreserved below and previously decided in precedent).

We hold the issue is unpreserved and will not consider it further.

THE DECISION TO AUTHORIZE ADULT PROSECUTION

Samuel claims the district court abused its discretion in applying K.S.A. 2012 Supp. 38-2347(e) (eight factors for district court to consider in authorizing adult prosecution). He argues: (1) the district court interpreted the statute in such a way that made part of it redundant; (2) its factual findings are not supported by substantial competent evidence; and (3) it applied an incorrect legal standard. We disagree.

*Additional facts*

After an evidentiary hearing on the State's motion to prosecute Samuel as an adult, the district court issued a written decision granting the motion. In doing so, it made the following findings of fact and conclusions of law that correspond to each factor itemized in K.S.A. 2012 Supp. 38-2347(e):

> "[Factor one:] Regarding the seriousness of the alleged offenses and whether the protection of the community requires prosecution as an adult or designating the proceeding as an extended jurisdiction juvenile prosecution[,] the court finds there can be no more egregious offenses than ones involving the taking of human lives, nor anything that more evidences the need for protection of the community.

> "[Factors two and three:] The court finds that the offenses were apparently committed in a premeditated or willful manner as described by law enforcement testimony and that the offenses were against both people and property. The result of the offenses were not just personal injury, and damage to property, but loss of life. [Factor four:] There are six highly serious unadjudicated felony offenses pending against Mr. Vonachen.

> "[Factor five:] Samuel Vonachen has absolutely no previous history of behaviors of violence or retribution or aggression. He has never been charged, much less adjudicated, as a juvenile offender under Kansas law. The court did not hear evidence of

25

any other previous history of antisocial behavior. [Factor six:] Samuel does not appear to be sophisticated or mature beyond his years and his father described a normal home life and environment and a typical 14-year-old pattern of living with no pronounced desire to be treated as an adult. His performance in school was not troublesome and his grades were above average.

"[Factors seven and eight:] The final two factors enumerated in the code are enmeshed, in the opinion of this court. Are there facilities or programs available to the court which are likely to rehabilitate the juvenile prior to the expiration of the court's jurisdiction when this 15-year-old adolescent reaches the age of 22.5 years, the age that juvenile court jurisdiction would end? While it is true that no interventions have been made, through all the evaluations and evidence and records provided, this horrific crime was not predictable or provoked. This court is not able to fathom how the juvenile justice system could rehabilitate this young man in eight years. Because there is a shroud of mystery surrounding the motivation of this juvenile to take the actions he did, it is unknown how to guarantee the safety of the community or his family. This court must find, with deep reluctance but complete certainty that the interests of the community would be better served by criminal prosecution of this 15-year-old child."

*Standard of review*

On appeal, the court's ruling on a motion to authorize prosecution as an adult is subject to a dual standard of review. Its factual findings are evaluated for substantial competent evidence. An appellate court does not reweigh evidence or make credibility determinations in doing this evaluation. The court's ultimate legal assessment of the eight statutory factors guiding its decision, based upon the factual findings, is reviewed for an abuse of discretion. *State v. Sanders*, 310 Kan. 279, 294, 445 P.3d 1144 (2019); *State v. Brown*, 300 Kan. 542, 545-46, 331 P.3d 781 (2014).

A district court abuses its discretion when: (1) no reasonable person would take its view; (2) its ruling is based on an error of law; or (3) substantial competent evidence

26

does not support a factual finding on which the exercise of discretion is based. *Brown*, 300 Kan. at 546. To the extent the question requires an appellate court to interpret K.S.A. 2012 Supp. 38-2347(e), that review is unlimited. *State v. Dinkel*, 311 Kan. 553, 557, 465 P.3d 166 (2020).

*Discussion*

Generally, a juvenile offender is "presumed to be a juvenile unless good cause is shown to prosecute the juvenile as an adult." K.S.A. 2012 Supp. 38-2347(a)(1). "The alleged juvenile offender shall be presumed to be an adult" when, as here, the juvenile was "14, 15, 16 or 17 years of age at the time of the offense or offenses alleged in the complaint, if any such offense . . . [i]f committed by an adult, would constitute an off-grid crime . . . ." K.S.A. 2012 Supp. 38-2347(a)(2). And "[i]f the juvenile is presumed to be an adult, the burden is on the juvenile to rebut the presumption by a preponderance of the evidence." K.S.A. 2012 Supp. 38-2347(a)(2).

K.S.A. 2012 Supp. 38-2347(e) sets out eight factors to consider when deciding whether to authorize a juvenile for adult prosecution. These are:

"(1) The seriousness of the alleged offense and whether the protection of the community requires prosecution as an adult or designating the proceeding as an extended jurisdiction juvenile prosecution;

"(2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;

"(3) whether the offense was against a person or against property. Greater weight shall be given to offenses against persons, especially if personal injury resulted;

27

"(4) the number of alleged offenses unadjudicated and pending against the juvenile;

"(5) the previous history of the juvenile, including whether the juvenile had been adjudicated a juvenile offender under this code or the Kansas juvenile justice code and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence;

"(6) the sophistication or maturity of the juvenile as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living or desire to be treated as an adult;

"(7) whether there are facilities or programs available to the court which are likely to rehabilitate the juvenile prior to the expiration of the court's jurisdiction under this code; and

"(8) whether the interests of the juvenile or of the community would be better served by criminal prosecution or extended jurisdiction juvenile prosecution.

"The insufficiency of evidence pertaining to any one or more of the factors listed in this subsection, in and of itself, shall not be determinative of the issue." K.S.A. 2012 Supp. 38-2347(e).

Samuel's first claim relates to the district court's rulings on the first three factors. He argues weighing all three against him made part of subsection (e) surplus since his charged offenses were off-grid felonies. In his view, when dealing with an off-grid felony, the first, second, and third factors necessarily become redundant because off-grid felonies are always "'serious'" crimes, and "offenses are classified as off-grid only when they are 'committed in an aggressive, violent, premeditated or willful manner' and when they constitute crimes [against] persons, rather than against property." In other words, Samuel argues the court erred in interpreting subsection (e).

28

We rejected this argument when it was raised by a juvenile charged with felony murder. See *Brown*, 300 Kan. at 552 ("Each of these first three factors concern different subject matter. . . . They are not redundant or surplus just because they might necessarily weigh in favor of adult prosecution when particular crimes are alleged."). Moreover, the unambiguous language of K.S.A. 2012 Supp. 38-2347(e) plainly requires the court to ground its analysis in a particular case's factual considerations, not any categorization under the Kansas Criminal Code. If the Legislature intended for factors one through three to be satisfied and considered as a single factor anytime the charged crime is an off-grid offense, it would have said so. See 300 Kan. at 552 ("[T]he legislature enumerated all three factors while simultaneously recognizing the possibility the juvenile could be charged with an off-grid offense."); *State v. Williams*, 311 Kan. 88, 93, 456 P.3d 540 (2020) (plain and unambiguous language guides courts' interpretation of the statute); *State v. Ayers*, 309 Kan. 162, 164, 432 P.3d 663 (2019) (clear and unambiguous statute must be given effect as written).

It is also worth noting K.S.A. 2012 Supp. 38-2347(e)'s clarification that, "The insufficiency of evidence pertaining to any one or more of the factors listed in this subsection, in and of itself, shall not be determinative of the issue." This means the Legislature intended a holistic analysis, not simply a numerical calculation of how many factors weighed for or against the juvenile.

Samuel asserts the fourth factor "should have weighed in [his] favor" because "[t]o interpret the fourth factor to also refer to the offenses in the present case, would require even more redundancy." In his view, subsection (e)(4)'s text—"the number of alleged offenses unadjudicated and pending against the juvenile"—must mean something outside the pending crimes charged. But that reading requires this court to "add something not

29

readily found in the statute" and ignore our directive that "a clear and unambiguous statute must be given effect as written." *Ayers*, 309 Kan. at 164.

Next, Samuel contends the court's ruling on the seventh factor that "no rehabilitation was available" is unsupported by substantial competent evidence. For this he points out that Bruce Nystrom, a licensed psychologist who testified at the hearing, said that at Samuel's age his "psychological maturity is lacking . . . not fully formed." So he did not need any treatment or medication, but he might need them "[i]n the future."

But this fails for two reasons. First, Nystrom's testimony was at most neutral, and not particularly supporting either side. Second, the district court's ruling is supported by substantial competent evidence, and therefore what Samuel is asking is for this court to reweigh the evidence. See *Sanders*, 310 Kan. at 294 (appellate court must not reweigh evidence or make credibility determination when reviewing the district court's factual findings). In its written opinion, the district court indicated it "reviewed the file, heard the witnesses, received and reviewed the evidence" in making its findings. The court's findings—that "this horrific crime was not predictable or provoked," and because of that it was "not able to fathom how the juvenile justice system could rehabilitate this young man in eight years"—are supported by the interview video and the psychologists who evaluated Samuel's mental status.

Finally, Samuel claims the court applied an incorrect legal standard when it stated "it is unknown how to guarantee the safety of the community or his family." He reasons nothing in the statute required him to provide "any sort of guarantee that adjudication as a juvenile will ensure the safety of the community and his family," and therefore, by doing this, the court "inflated [his] burden from 'preponderance of the evidence' to even higher than the prosecution's burden of 'beyond a reasonable doubt.' For there to be a guarantee would require proof beyond *all* doubt."

30

This argument simply reflects Samuel's misunderstanding of the district court's ruling. First, as explicitly stated in its opinion, the district court only required Samuel to rebut the statutory presumption under K.S.A. 2012 Supp. 38-2347(a)(2) by a preponderance of the evidence. And the court further expressed,

"This court must find, with deep reluctance but complete certainty that the interests of the community would be better served by criminal prosecution of this [then] 15-year-old child.

"Accordingly, this court finds that there is a preponderance of evidence that [Samuel] should be prosecuted as an adult for the offenses charged."

The court at no time demanded a heavier burden than required by statute. And while it used the term "guarantee," it did not use it to inflate Samuel's statutory burden.

Affirmed.

SALLY D. POKORNY, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** District Judge Pokorny was appointed to hear case No. 118,361 under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution to fill the vacancy on the court by the retirement of Justice Carol A. Beier.